JUDGE CHIN    09 CV  3174

Jeffrey A. Udell
Melanie J. Sacks
OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
*Attorneys for Plaintiff*
*Joseph P. Carroll Limited*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH P. CARROLL LIMITED,<br><br>         Plaintiff,<br><br>   -against-<br><br>CRAIG BAKER,<br><br>         Defendant. | No. 09 Civ. _____<br><br>**COMPLAINT** |

RECEIVED APR - 2 2009 U.S.D.C. S.D.N.Y. CASHIERS

  Joseph P. Carroll Limited ("Carroll" or "Plaintiff"), by its undersigned attorneys, alleges on knowledge as to its own acts and otherwise upon information and belief as follows:

### Nature of Complaint

  1. Carroll brings this complaint seeking declaratory relief, to quiet title and to establish that it has full, right and proper title to the painting known as "Untitled, 1943" by John Graham, measuring 24 3/8 inches by 20 inches (the "Painting").

  2. Carroll's claim arises out of erroneous, wrongful and damaging assertions made by defendant Craig Baker ("Baker" or "Defendant"), who claims ownership of the Painting.

  3. By assertion of his meritless claim of ownership, Baker hampers Carroll's ability to sell the Painting and also threatens to irreparably harm Carroll's stature in the international art

610701-4

community and marketplace. Accordingly, Carroll seeks this Court's assistance in clearing title to the Painting in its favor, and declaring that Baker has no ownership interest in the Painting.

## Jurisdiction and Venue

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because Baker, upon information and belief, is a citizen of Massachusetts, Carroll is a citizen of New York, and the amount in controversy, exclusive of interest and costs, is in excess of $75,000.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims alleged in this matter occurred in this district, and the property that is the subject of this litigation, the Painting, is here.

## Statement of Facts

A. The Parties

6. Plaintiff Carroll is a New York corporation with its principal place of business in New York, New York.

7. Non-party, The Honorable Joseph P. Carroll ("Mr. Carroll") is an individual, a resident of the State of New York, and an international museum curator, philanthropist, and private art dealer who has been in the business of buying works of art for resale for nearly 35 years. Mr. Carroll manages the affairs of Carroll.

8. Defendant Baker, upon information and belief, is a citizen of the State of Massachusetts. Upon information and belief, Baker is a sophisticated art dealer, and an experienced art investor.

9. Non-party Lawrence Salander ("Salander"), upon information and belief, was, at all times relative to this Complaint, the Managing Member of Salander-O'Reilly Galleries, LLC ("SOG"), a once preeminent fine art gallery located in Manhattan. Prior to August 2007,

Salander was known to Carroll as a reputable, honest, and well-respected art merchant, as evidenced by an article about Salander and SOG that appeared in the Wall Street Journal in 2005. (*See* Roger Kimball, *A Commercial Art Gallery That Feels Like A Museum*, W.S. Journal, Sept. 27, 2005, at D10, attached hereto as Exhibit A). Salander and SOG were widely considered to be market makers for the work of many prominent 20th Century American artists, in whose work they dealt heavily, including that of John Graham.

B. The Sale of the Painting to Carroll

10. Over the course of approximately seven years, beginning in or about October 2000, numerous representatives of SOG -- including Leigh Morse, SOG's Director, and Steve Harvey, an employee -- attempted to sell Carroll the Painting.

11. On January 31, 2007, Carroll purchased the Painting from SOG along with twenty-three other paintings (the "Sale"). Carroll's purchase of the Painting is memorialized in the invoice attached hereto as Exhibit B.

12. SOG's retail asking price for the Painting, as indicated in Exhibit B, was $175,000. Carroll and SOG agreed that this retail asking price was unrealistically high, as SOG had offered the Painting for sale for over a seven-year period and it remained unsold. Indeed, SOG's $175,000 retail asking price would have made it the highest recorded public purchase price ever paid for a John Graham painting over the preceding five years, were SOG otherwise able to sell the Painting in January 2007.

13. Carroll paid $105,000 -- reflecting a 40% discount applied to the $175,000 retail asking list price for the Painting. This discount was applied by SOG to the price of all of the works purchased in the Sale because, among other reasons, SOR and Carroll agreed that SOG's asking list prices were unrealistically high. Moreover, it is customary in the art market to give

any customer a discount off of the asking list price and an additional discount where, as here, the artwork is purchased outright for cash (paid by check), rather than over an extended time period. Finally, it is further customary in the art market to give Carroll, as an art dealer who regularly buys and sells works of fine art, an additional discount off the asking list price.

14. Carroll is one of the leading collectors of John Graham paintings in the country. Indeed, the $105,000 net purchase price that Carroll paid for the Painting in January 2007 was the second highest recorded public purchase price ever paid for a John Graham painting over the preceding five years.

15. Prior to the Sale, Carroll had no knowledge that any of the artwork acquired in the Sale -- including the Painting -- was held by Salander or SOG on consignment from Baker.

C. Carroll's Due Diligence Prior to Purchasing the Painting

16. In accordance with Carroll's customary practice of conducting due diligence prior to purchasing works of art from art merchants, including Salander and SOG, Mr. Carroll, on behalf of Carroll, demanded and inspected detailed written cataloguing and provenance statements for the Painting. None of the documents inspected by Mr. Carroll reflected that the Painting was on consignment or that Baker had any interest in the Painting.

17. As a further part of Carroll's customary due diligence, Mr. Carroll personally conducted a detailed physical examination of the Painting. Mr. Carroll found no indication on the Painting itself -- such as signage indicating that a piece was "on consignment" -- that would have led him to believe that Baker or any other party could claim an ownership or security interest in the Painting.

4

610701-4

18.     In further accordance with Carroll's customary due diligence, prior to purchasing the Painting, Mr. Carroll conducted UCC filing searches, freely available to the public. These searches yielded no indication of a consignment or security interest in the Painting by Baker.

19.     Thus, upon information and belief, Baker did not file any Form UCC-1 with respect to the Painting.

20.     In sum, prior to consummating the Sale, Carroll was unaware that Baker maintained or asserted any ownership interest whatsoever in the Painting, based upon, among other things: (1) the stellar reputation of Salander and SOG as pre-eminent art dealers and market makers in the fine art of 20th Century American artists, including John Graham; (2) the written cataloguing and provenance statements provided by Salander and SOG; (3) a thorough physical examination of the Painting; and (4) the lack of UCC financing statements with respect to the Painting.

D.      Carroll's Good Faith

21.     Prior to consummation of the Sale, Carroll was not aware of any financial difficulties or suspicion-raising need for cash on the part of Salander or SOG.

22.     Carroll purchased the Painting at a price that was both fair and reasonable, given the quantity of other works involved in the Sale, the quality of the Painting (particularly its poor condition and state of conservation), SOG's public position as a "market maker" for works of art by John Graham and other 20th Century American artists, general market conditions and the perceived significance of the Painting at the time. As previously noted, the $105,000 net purchase price that Carroll paid for the Painting in January 2007 was the second highest recorded public purchase price ever paid for a John Graham painting over the preceding five years.

23. Carroll conducted the Sale with the utmost good faith and in accordance with reasonable commercial standards of the art trade.

24. There was no circumstance about the Sale that suggested to Carroll -- or would have suggested to anyone in the art world -- that Salander or SOG were behaving in any way other than as honest, well-respected art merchants.

25. The consideration paid by Carroll for the Painting constituted "value" under New York's Uniform Commercial Code.

26. With respect to the Sale, Carroll is a "Good Faith Purchaser for Value" and a "Buyer in Ordinary Course of Business," within the meaning of the New York Uniform Commercial Code.

E. Baker's Assertions Regarding the Painting

27. On or about November 1, 2007, an involuntary bankruptcy petition was filed against SOG. That proceeding is captioned *In re Salander-O'Reilly Galleries, LLC*, Case No. 07-30005 (CGM), pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Proceeding").

28. The court in the Bankruptcy Proceeding set August 31, 2008 as the final "Bar Date" by which all proofs of claim upon the estate of SOG were to be filed. Defendant Baker did not file any claim in the Bankruptcy Proceeding by that date, or thereafter, upon information and belief.

29. Instead, on or about February 3, 2009, Baker moved in the Bankruptcy Proceeding to take the deposition of Mr. Carroll, pursuant to 11 U.S.C. § 105(a) and Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Motion").

30. Mr. Carroll's receipt of service of the Motion was the first time that either Mr. Carroll or Plaintiff Carroll was aware that any other party claimed ownership rights in the Painting. Mr. Carroll had never heard of Baker prior to that time.

31. In support of the Motion, Baker asserted that he had consigned the Painting to SOG for sale at a verbally agreed minimum price of $250,000. Baker further asserted that, pursuant to this alleged verbal agreement, SOG was to remit the sales proceeds to Baker, less a ten percent commission retained by SOG.

32. No consignment agreement, however, appeared in the Motion papers. Rather, Baker merely submitted a "Consignment receipt" (the term used by Baker in his Motion) from SOG stating that the Painting was one of two works "on consignment," and neglecting to specify any of the asserted terms of the alleged verbal consignment agreement.

33. In support of the Motion, Baker further asserted that SOG had sold the Painting to Mr. Carroll without informing Baker or remitting the sale proceeds to Baker, in violation of the alleged consignment agreement. Thus, Baker argued that he was entitled to discovery from Mr. Carroll, pursuant to 11 U.S.C. § 105(a) and Rule 2004 of the Federal Rules of Bankruptcy Procedure (collectively "Rule 2004"), due to the fact that he was a creditor of SOG.

34. In response to the Motion, Mr. Carroll argued, among other things, that: (i) Mr. Baker was not a "party in interest" entitled to discovery under Rule 2004, because the Bar Date had passed and he had not asserted a claim against the SOG bankruptcy estate; and (ii) the Motion sought discovery as to a non-bankruptcy related claim against Mr. Carroll, and was thus an improper use of Rule 2004.

35. Apparently realizing that he could not be a creditor in the Bankruptcy Proceeding because he missed the Bar Date for assertion of any such claims, Baker withdrew his Motion.

36.     Upon information and belief, based upon communications with his counsel, Baker has apparently now turned to Carroll, who is essentially the only remaining party against whom Baker could hope to recover his purported losses, occasioned by SOG's allegedly improper conduct.

F.     Baker's Ownership Claim Is Lacking

37.     Even Baker's claim of *prior* ownership of the Painting is severely lacking. In support of his purported claim, Baker has produced merely an invoice for a painting from Vanderwoude Tananbaum Gallery. *See* Invoice, dated June 16, 1982, affixed hereto as Exhibit C (the "Invoice").

38.     The Invoice explicitly states that full payment for the painting had not been received. Thus, the Invoice fails to demonstrate that Baker actually ever consummated a purchase of even the painting described in the Invoice.

39.     Furthermore, the Invoice lists certain identifying characteristics of the painting, allegedly consigned by Baker, that are inconsistent with the actual characteristics of the Painting:

(a)     First, the Invoice states that the painting allegedly consigned by Baker was signed and dated 1947 on its upper right. In fact, the Painting is dated 1943.

(b)     Second, the Invoice indicates that the painting allegedly consigned by Baker was 24 inches by 20 inches, whereas the actual Painting measures 24 3/8 inches by 20 inches.

(c)     Third, the Invoice states that the painting allegedly consigned by Baker is signed and dated on the reverse, whereas the Painting owned by Carroll is neither signed nor dated on the reverse.

8

610701-4

40.  The foregoing casts doubt on Baker's claim that he possesses any ownership interest in the Painting.

41.  Finally, even if Baker had acquired ownership of the Painting before consigning it to SOG, Carroll purchased the Painting in the Sale from SOG as a "Good Faith Purchaser for Value" and a "Buyer in Ordinary Course of Business," within the meaning of the New York Uniform Commercial Code. Accordingly, Baker has no recourse against Carroll.

## COUNT I
### (Declaratory Judgment)

42.  Carroll repeats the allegations set forth in paragraphs 1 through 40, as if set forth fully herein.

43.  Pursuant to the Sale, Carroll acquired full and clear title to, among other works, the Painting.

44.  Baker does not own, nor does he hold title to, nor does he have any other possessory interest in, the Painting. Nonetheless, he has asserted an ownership interest in it.

45.  There exists a present controversy between Carroll and Baker as to whether Carroll holds full and clear title to the Painting.

46.  Upon information and belief, such controversy has an adverse material effect upon the salability of the Painting, and threatens to have a similar adverse material effect upon both the value of the works and Carroll's stature and reputation in the international art world.

47.  Accordingly, Carroll seeks a declaration from this Court, pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, that it holds full, right and proper title to the Painting, to the exclusion of any interest claimed by Baker or any other party.

WHEREFORE, Carroll demands judgment as follows:

A. Awarding Carroll judgment on Count I, declaring that it holds full, right and proper title to the Painting; and

B. Awarding Carroll costs, attorneys' fees and such other additional relief as this Court deems just and proper.

Dated: New York, New York
April 1, 2009

OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP

By: _____
Jeffrey A. Udell (JU0411)
Melanie J. Sacks (MS7896)
*Attorneys for Plaintiff Joseph P. Carroll Limited*
Park Avenue Tower
65 East 55th Street
New York, New York 10022
(212) 451-2300

# EXHIBIT A

THE WALL STREET JOURNAL.    LEISURE & ARTS    TUESDAY, SEPTEMBER 27, 2005

# A Commercial Art Gallery That Feels Like a Museum

By Roger Kimball

*New York*

The date was May 2004. The occasion was an exhibition of Constable's paintings and sketches of skies from the 1820s. The place was the Salander-O'Reilly Galleries at 20 E. 79th St. How, I wondered, did Larry Salander, the gallery's owner, do it? Here was one of the most extraordinary exhibitions in New York, an exhibition to delight the connoisseur and beguile the casual art lover, full of rarely seen gems from private collections and famous pictures from London's Tate Gallery and Oxford's Ashmolean Museum. Not one object was for sale. And yet this was a commercial art gallery, not a museum.

Such exhibitions are a regular feature at Salander-O'Reilly, which officially opened a magnificent new gallery at 22 E. 71st St. last week, just down from the Frick Collection. I remember another show at Salander of late works by Corot, organized to coincide with the Metropolitan Museum's big Corot exhibition in 1996. Then there was the Courbet exhibit two years later. In 2000, there was "Rembrandt and the Venetian Influence." And on and on.

You feel a double amazement at such shows: first at the sheer quality of the work—somehow, Mr. Salander is able to coax museums and private collectors to lend him their dearest treasures. Then you are amazed all over again that these exhibitions are mounted not to sell the works but as a sort of public service. Precious few galleries mount such museum-quality shows without also attempting to unload some of the work. Then, too, many museums exact a hefty admission fee—the Museum of Modern Art now wants $20 to let you in—while galleries are free. The best galleries, like Salander, also offer an experience of art that is at once more intimate and also more immediate, closer to the making of art, than most museums.

Of course, Salander-O'Reilly is also in the business of selling art. And it has sold lots of it. Since the gallery opened nearly 30 years ago, it has mounted more than 300 exhibitions, in most of which some or all of the work was for sale. Mr. Salander has lured first-rate curatorial talent to join him. Andrew Butterfield, Fred Bancroft, Steven Harvey, Leigh Morse and other members of his senior staff—people who've been tempted away from high-class academic or museum posts—help make it all possible, organizing brilliant shows accompanied by catalogs that are at once handsome and scholarly.

The gallery represents the estates of such modern masters as Eli Nadelman, Stuart Davis, Gaston Lachaise, Leland Bell, Suzy Frelinghuysen, Arnold Friedman and Marsden Hartley. It has shown the work of some of the most accomplished contemporary artists, including Lennart Anderson, John Dubrow, Tom Goldenberg, Paul Resika and Graham Nickson. It also handles older works, from Italian Renaissance sculpture and painting through 19th-century French, English and American art.

But Larry Salander is expert at juggling commerce and aesthetic philanthropy. "It's all about giving back," he said recently when we toured his new galleries. An intense, kinetic man of 56, Mr. Salander is an unlikely combination of bluff New Yorker and impassioned aesthete. We pause over a small landscape that Delacroix created when he went out painting one day with John Constable on Hampstead Heath in 1825. The prospect, Mr. Salander points out, is just down the hill from where Constable sat to paint the same scene. In Constable's picture, the tiny figure in the distance may well be Delacroix, who first saw Constable's work in Paris the year before at the Salon. It was a revelation. Delacroix rushed back to his studio and repainted portions of "The Massacre at Chios" (now at the Louvre), his own contribution to the 1824 Salon, under Constable's inspiration.



*Larry Salander*

Although Mr. Salander has been involved with art since childhood—he cut his teeth working in his father's antique shop and is an accomplished painter in his own right—he exudes a relaxed toughness unusual in the refined purlieus of the art world. His enthusiasm for art is palpable, irrepressible, infectious. Art puts us in touch with "something bigger than we are," he insists, pointing out a Veronese, an Ingres, a Goya in one of the elegant first-floor galleries of his new headquarters.

If Mr. Salander's aesthetic fervor bubbles over, so does his contempt for the aesthetically meretricious. His tastes range widely but his standards are exacting. "Quality" is a word that often falls from his lips. Matthew Barney? Awful. Jeff Koons? Don't get him started. A unique polychrome terra cotta by Della Robbia at Salander-O'Reilly doesn't come cheap. But this Renaissance work will fetch a small fraction of the $5 million-plus that a Koons sculpture draws. Mr. Koons famously does not fabricate his work, but leaves it, as Mr. Salander bitingly observed, to "fine Italian craftsmen, none of whom is Jeff Koons."

In 1976, Mr. Salander teamed up with William O'Reilly (who left the business in 1993) and they opened the doors of their first gallery at 831 Madison Ave. Over the next decade the gallery moved several times before coming to rest, in 1989, in the neoclassical townhouse on East 79th Street that had been designed by Cass Gilbert for the collection of Chester Dale and was previously the home of the fabled Paul Rosenberg Gallery.

The 79th Street gallery, which will continue to show modern and contemporary art, is a sumptuous, marble-floored edifice. But it seems almost modest by comparison with Salander-O'Reilly's palatial new gallery on East 71st Street, which will concentrate on art from the Renaissance through the 19th century. At 5,000 square feet, the 79th Street venue is large. At 25,000 square feet, the new Salander-O'Reilly, also designed by Cass Gilbert, is gargantuan, splendid, audacious. Arnold Palmer used to have his office there. The door to the bar, Mr. Salander notes, pointing out the much-used handle, was obviously opened often.

What was a golfer's retreat is now an art lover's treasure trove. Gargoyles from Strasbourg Cathedral; canvases by Titian, Botticelli, El Greco and Rubens; sculpture by scores of Italian masters: Visiting Salander-O'Reilly is like visiting a superb museum.

One of Mr. Salander's recent acquisitions is a stunning life-size bronze of Christ crucified, by the great Baroque sculptor Bernini. It is, Mr. Salander told me, running his fingers over the lineaments of genius, the only work that Bernini had cast for himself. "If there is no such thing as God, explain this," Mr. Salander said. Shortly before his death in 1680, Bernini gave the piece to his friend Cardinal Sforza Pallavicino. In the 1930s, the piece turned up and was advertised as being by a follower of Giovanni da Bologna. It was sold from the collection of Geraldine Rockefeller Dodge in 1975 for $3,000. Mr. Salander first saw it last year in the back of a truck at 4:30 a.m. outside the Dorchester Hotel in London. He knew what it was and that he had to have it.

I've seen that Bernini four times now. I hope to see it another 40. Mr. Salander is not advertising its price tag, but someday, a lucky museum or individual will get it. Until then, you, too, can commune with this masterwork in intimate surroundings like the living room you always planned to have.

*Mr. Kimball is co-editor and publisher of the New Criterion.*

# EXHIBIT B

# SALANDER-O'REILLY GALLERIES, LLC

22 East 71 Street   New York, NY 10021   Telephone 212-879-6606   FAX 212-400-4490

January 31, 2007                                                                    INVOICE

Sold to:
Joseph P. Carroll Ltd.
PO Box 111, Lenox Hill
New York, NY 10021

| | | |
|---|---|---|
| 1. | William Bailey<br>*Reflection*<br>2000<br>oil on canvas<br>60 x 50 inches<br>SOR # 18544 | $75,000.00 |
| 2. | William Bailey<br>*Hilary*<br>1963<br>oil on canvas<br>49 ½ x 27 ½ inches<br>SOR # 27571 | $45,000.00 |
| 3. | William Bailey<br>*Still Life with Three Bowls, an Egg and a White Pitcher*<br>1972 – 73<br>oil on canvas<br>29 7/8 x 36 1/8 inches<br>SOR # 27370 | $50,000.00 |
| 4. | John Graham<br>*Untitled*<br>1943<br>oil on canvas<br>24 3/8 x 20 inches<br>SOR # 11005 | $175,000.00 |
| 5. | Arthur Dove<br>*Ladder*<br>1934<br>watercolor on paper<br>12 x 10 inches<br>SOR # 11662 | $35,000.00 |
| 6. | Alfred H. Maurer<br>*Landscape*<br>c. 1915<br>oil on panel<br>18 x 21 inches<br>SOR # 26413 | $60,000.00 |

275
HL EKF¼

| | | |
|---|---|---|
| 21. | Arnold H. Ronnebeck<br>*Female Nude Holding a Staff*<br>1935<br>18 ¾ x 4 1/8 x 1 15/16 inches<br>SOR # 24411 | (2 of 4) |
| 22. | Arnold H. Ronnebeck<br>*Female Nude*<br>undated<br>wood<br>17 x 9 ¼ x 4 ¾ inches<br>SOR # 24413 | (3 of 4) |
| 23. | Arnold H. Ronnebeck<br>*Female Nude*<br>undated<br>wood<br>16 ½ x 10 7/8 x 4 inches<br>SOR # 24414 | (4 of 4) |
| 24. | Theodore Butler<br>*Landscape*<br>undated<br>oil on canvas<br>31 x 39 1/8 inches<br>27630 | $0.00 |

|  |  |
|---|---|
| Sub Total | $740,000.00 |
| 40 % Discount | ($296,000.00) |
| **TOTAL** | **$444,000.00** |

*Paid # 341 Citibank JPL EKF* (handwritten)

**Terms of Sale**: 1. All risks of loss of the object(s) described above shall pass upon delivery to the address specified. Financing statements may be filed. 2. This agreement is governed by the law of the State of New York applicable to contracts made and performed solely in such state. Any controversy or claim arising out of or relating to this agreement, or the breach hereof, shall be settled by arbitration in New York City, administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules then in effect. The arbitrator(s) shall award to the prevailing party, as determined by the arbitrator(s), all of its costs and fees of enforcing this agreement and any award, including, without limitation, the expenses of arbitration and judicial proceedings, arbitrators' fees, attorneys' fees, other collection expenses, and other out-of-pocket expenses such as copying, telephone, travel expenses, court costs, and witness fees. The costs, fees and expenses of enforcing each arbitration award and any related judgment may be awarded in the same arbitration or in subsequent arbitrations and judicial proceedings. Judgment upon each arbitration award may be entered in any court having jurisdiction thereof. The parities jointly and severally hereby represent and warrant that they are each solvent, able to pay their debts as they come due, not contemplating any insolvency proceedings, that the value of their assets exceeds the amount of their liabilities, and agree to the above as evidenced by their separate signatures below.

Joseph P. Carroll Ltd.
NY State Resale # 13-3439673
1/31/07

Salander-O'Reilly Galleries LLC
NY State Resale # 13-3803-733
1·31·07

278
JPL EKF 4/4

SALANDER-O'REILLY GALLERIES, LLC
22 East 71 Street  New York, NY 10021  Telephone 212-879-6606  FAX 212-400-4490

## JOHN GRAHAM
(1887 - 1961)

*Untitled*
1943
oil on canvas
24 3/8 x 20 inches

Provenance:

The Artist

Private Collection

Vanderwoude Tanabaum Gallery

Salander-O'Reilly Galleries, New York, SOR# 11005

Exhibitions:

*John Graham: Artist and Avatar*, organized by the Phillips Collection, Washington, D.C.
    (Traveled: Neuberger Museum, State University of New York at Purchase,
    June 25 - September 12, 1987; Newport Harbor Art Museum, Newport Beach,
    California, October 23, 1987 - January 3, 1988; University Art Museum,
    University of California, Berkeley, January 20 - March 20, 1988; The David and
    Alfred Smart Gallery of the University of Chicago, April 14 - June 12, 1988;
    The Phillips Collection, Washington, D.C., July 9, September 4, 1988)

Literature:

Green, Eleanor. John Graham: Artist and Avatar, Catalogue of an exhibition held at
    the Philips Collection, Washington, D.C., fig 69, illustrated p. 112.

286

# EXHIBIT C

557177-2



June 16, 1982

Invoice to:

Mr. Craig Baker
P O. Box 493
Greenwich, Conn. 06386

Send to:

Above address

Sale of:

John Graham
1881-1961
UNTITLED (Portrait of a Woman)
1947
oil on canvas
24 x 20 inches
signed and dated upper right and on the reverse
price: $53,000.00

Provenance:
Private collection, New York (purchased by current owner's mother)

Terms:

No N.Y.S. sales tax- shipped out of state

Immediate deposit upon receipt of invoice; balance to be paid upon completion of restoration work by Margaret Watherston.

VANDERWOUDE TANANBAUM GALLERY 24 E 81 STREET/NEW YORK CITY 10028/212.879.8200