UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

JOSEPH P. CARROLL LIMITED,                              :
                                                       :    09 Civ. 3174 (SHS)
                                   Plaintiff,           :    OPINION AND ORDER
                                                       :
                    -against-                           :
                                                       :
CRAIG BAKER,                                            :
                                                       :
                                   Defendant.           :
-------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

       This declaratory judgment action was tried to this Court on April 25-27, 2012.   The

Court finds that Joseph P. Carroll Limited was a buyer in the ordinary course of business and is

entitled to a declaration that it has full title to the painting *Untitled (1943)* by John D. Graham.

Accordingly, judgment shall be entered in favor of Joseph P. Carroll Limited.  The following are

the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules

of Civil Procedure.[1]

## I.      FINDINGS OF FACT

       A.      <u>Jurisdiction</u>

       The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because

plaintiff Carroll Limited is a citizen of New York, defendant Baker is a citizen of Massachusetts,

and the amount in controversy exceeds $75,000.  (Complaint ¶ 4; Answer ¶ 4; Apr. 26 Tr. at

201:5-6.)

---

[1] To the extent that any finding of fact may be deemed a conclusion of law, it shall also be considered a conclusion of law.  Similarly, to the extent that any conclusion of law may be deemed a finding of fact, it shall be considered such a finding.  *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985); *Sanofi-Synthelabo v. Apotex, Inc.*, 492 F. Supp. 2d 353, 356 (S.D.N.Y. 2007).

B.      The Parties

Plaintiff Joseph P. Carroll Limited is a corporation formed under New York law.  (Trial

Tr. dated Apr. 25, 2012 at 11:20-25; Stipulation of Fact, Ex. A to Joint Pretrial Disclosures ¶ 1.)

Joseph P. Carroll, its sole stockholder and president, is a museum curator, philanthropist and

private art dealer.  (Apr. 25 Tr. at 8:6-10, 12:9-11; Stipulation of Fact ¶ 2.)  Defendant Craig

Baker is an art collector who owns a collection of artwork valued at several million dollars.

(Trial Tr. dated Apr. 26, 2012 at 259:3-16; Stipulation of Fact ¶ 3.)  Non-party Salander-O'Reilly

Galleries ("SOG") was, until late 2007, according to the stipulation of the parties, "a prominent

art gallery."  (Stipulation of Fact ¶ 4.)  Lawrence Salander was the principal of SOG until 2007,

when it entered bankruptcy.  (Stipulation of Fact ¶ 5; Apr. 26 Tr. at 279:22-25.)  Salander was

subsequently indicted for, *inter alia*, fraud and grand larceny relating to his management of the

art gallery and is now serving a prison term.  *See People v. Salander*, No. 03581/2009 (Sup. Ct.,

N.Y. Co.).

C.      Baker's Purchase and Consignment of the Painting

The parties dispute the ownership of the painting *Untitled (1943)* by John D. Graham

("the Painting, or *Untitled (1943)*"), a twentieth-century American modernist painter.

(Stipulation of Fact ¶ 6.)  In 1982, Baker purchased the Painting from the Vanderwoude

Tananbaum Gallery.  (Apr. 26 Tr. at 259:22-260:3; Stipulation of Fact ¶ 7.)  Baker's purchase of

the Painting was not publicized, since it was a private sale.  (Stipulation of Fact ¶ 8.)  In July

2000, Baker orally consigned the Painting to SOG.  (Apr. 26 Tr. at 261:1-6, 265:16-266:15;

Stipulation of Fact ¶¶ 9-10.)  The terms of the oral consignment agreement provided that SOG

was not to sell the Painting for less than $250,000.  (Apr. 26 Tr. at 265:23-266:2.)  That was not

based upon a formal appraisal of the Painting, but rather was based on a representation by Leigh

Morse—director of SOG—of the price the gallery would ask for the work.  (Apr. 26 Tr. at 261:7-12, 267:4-17.)  Baker never filed a U.C.C. financing statement recording his interest in the Painting nor did he publicize the consignment of the Painting to SOG.  (Apr. 26 Tr. at 273:14-23; Stipulation of Fact ¶¶ 12-13.)   Between July 2000 and mid-2007, Baker orally consigned more than forty other works of art to SOG.  (Stipulation of Fact ¶¶ 14-15.)   Baker neither filed U.C.C. financing statements nor publicized the consignment of those works.  (Stipulation of Fact ¶¶ 16-17.)

After the consignment of *Untitled (1943)* in 2000, Baker had "periodic conversations" with Morse "a couple of times a year" about the work and, once during a visit to the gallery, observed the work hanging in Morse's office.  (Apr. 26 Tr. at 268:24-269:14.)  Baker "never saw any stickers or marks or identification on the painting saying 'consignment' or reflecting that [the painting] was on consignment."  (Apr. 26 Tr. at 270:12-20.)  The Painting remained on consignment at SOG until January 2007 (Stipulation of Fact ¶ 18), when it was purchased by plaintiff.

> D.      Carroll Limited's Relationship with Salander-O'Reilly Galleries

Joseph Carroll met Salander in 1993 and first purchased art from SOG in 1998.  (Apr. 25 Tr. at 18:6-13.)  From 1998 to 2007, Carroll purchased approximately 120-150 pieces of art from SOG.  (Apr. 25 Tr. at 18:14-17; Stipulation of Fact ¶ 20.)  With two exceptions, Carroll purchased all of this art from SOG "in groups."  (Apr. 25 Tr. at 18:24-19:8.)  Unless Carroll was purchasing art at an auction, his usual method of purchasing art was to buy multiple paintings at once.  (Apr. 25 Tr. at 19:9-16.)

In the spring of 2006, Carroll noticed that SOG was sometimes referred to in documents as "Salander-O'Reilly LLC" and sometimes as "Salander-O'Reilly, Incorporated."  (Apr. 25 Tr.

at 80:24-81:15.)  Carroll was not concerned with which particular entity he dealt with, but rather that he understand which entity was on the other end of the relevant transaction.  (Apr. 25 Tr. at 80:24-81:15.)  He testified that he eventually received a "straight answer" from the gallery as to which business entity he was dealing with.  (Apr. 25 Tr. at 81:8-17.)

That same year, Carroll discovered that First Republic Bank had placed two or three general asset liens on Salander-O'Reilly LLC.  (Apr. 25 Tr. at 76:5-10, 165:13-22.)  Carroll viewed the presence of these liens as "normal."  (Apr. 25 Tr. at 76:5-10.)  He also knew that there were specific liens on particular pieces of art at SOG, but he did not consider the specific liens to be problematic as long as the liens were not attached to a piece of artwork that he was considering purchasing.  (Apr. 25 Tr. at 165:25-167:2.)

In August or September of 2006, Carroll visited SOG and noticed that the gallery was creating a "catalogue raisonné"[2] of the artist Stuart Davis's works.  (Apr. 25 Tr. at 86:19-89:12.)  Carroll believed that SOG's compilation of Davis's catalogue raisonné created a conflict of interest for SOG because SOG also sold works by Davis which it was simultaneously identifying as authentic in a comprehensive listing of Davis's works. (Apr. 25 Tr. at 88:2-16.)  Carroll expressed this view to Davis's son, who relayed the substance of the conversation to Salander. (Apr. 25 Tr. at 91:3-13.)  Salander subsequently asked Carroll to "come over" and "blew up at [him]" (Apr. 25 Tr. at 91:3-13), presumably for having questioned his integrity to Davis's son. However, this conversation did "not have any impact on the reputation and regard in which

---

[2] A "catalogue raisonné" is a "definitive catalogue of the life's work of [a] painter."  (Apr. 25 Tr. at 88:22-25); *see also* New York Public Library, *What is a Catalogue Raisonné?*, http://www.nypl.org/locations/tid/36/node/29583 (defining a catalogue raisonné as "a comprehensive, annotated listing of all the known works of an artist either in a particular medium or all media").

[Carroll] held . . .  either Mr. Salander or the Gallery," according to Carroll.  (Apr. 25 Tr. at 91:14-18.)

Later that fall, SOG expressed an interest in purchasing artwork from Carroll.  (Apr. 25 Tr. at 91:19-92:16.)  Although SOG proposed paying for the works by postdated check (Apr. 25 Tr. at 91:19-92:16), Carroll's attorney advised him not to accept a postdated check, and Carroll refused to do so (Apr. 25 Tr. at 92:2-92:16).  Carroll nonetheless ultimately sold the works to SOG.  (Apr. 25 Tr. at 92:17-19.)

    E.      <u>Carroll Limited's Acquisition of the Painting</u>

Carroll first saw the Painting—hanging in Morse's office—during a visit to SOG in the fall of 2000.  (Apr. 25 Tr. at 30: 19-22, 30:23-31:15; Stipulation of Fact ¶ 21.)  Carroll is a collector of Graham paintings—in 2000, he owned approximately twenty-four Graham works—and he expressed interest in *Untitled (1943)*.  (Apr. 25 Tr. at 31:15-21, 32:25-33:6.)  Salander informed Carroll that he "wanted $175,000 for it."  (Apr. 25 Tr. at 32:4-8.)  Neither Salander nor any SOG staff member informed Baker that the Painting was held by SOG on consignment only and was not owned by SOG.  (Apr. 25 Tr. at 37:15-19; Stipulation of Fact ¶ 22.)  Carroll told Salander he "thought [the $175,000 asking price] was too much" and "told him the reasons why."  (Apr. 25 Tr. at 32:4-8.)  Carroll told Salander that pieces such as *Untitled (1943)*, from Graham's middle period, command lower prices than pieces from Graham's later so-called "masochistic period"[3]  and that pieces from the middle period would normally sell in the range of $50,000-$100,000.  (Apr. 25 Tr. at 32:9-24.)  Carroll did not purchase the Painting in 2000. (Apr. 25 Tr. at 37:13-14.)

---

[3] Dr. Alex Rosenberg testified that paintings from Graham's "masochistic period"—in the 1950s—depict "a woman either battered" or with "cuts" or "bleeding in places."  (Apr. 26 Tr. at 212:8-10.)

In early January 2007, Carroll received a call from Salander saying that "he wanted me to come over and take a look at some pieces" of artwork. (Apr. 25 Tr. at 40:4-11.) As Carroll was soon to be leaving for Paris, he told Salander to send the materials to his office, and he would review them when he returned. (Apr. 25 Tr. at 40:4-11.) It was not unusual for Salander to call Carroll into the gallery to look at artwork, particularly because, according to Carroll, Salander understood the type of artwork that would interest Carroll. (Apr. 25 Tr. at 40:16-41:19.) Although defense counsel questioned whether this phone call actually took place, because Carroll did not refer to it in the course of his deposition (Apr. 15 Tr. at 132:20-135:10), this Court credits Carroll's testimony on the issue and finds that there is no inconsistency between his deposition testimony and his trial testimony on the question of the telephone call. (*See* Apr. 25 Tr. at 132:2-136:10.)

During this phone call, Carroll told Salander that he would be willing to purchase the art only if given a forty-percent discount off the list price. (Apr. 25 Tr. at 44:10-22.) Although Salander did not generally negotiate his prices (Apr. 25 Tr. at 122:9-21), he did offer discounted prices (*see* Apr. 25 Tr. at 45:6-46:25, 124:18-125). In early 2006, at the Miami-Basel art fair, Carroll had purchased several paintings from Salander at a forty-percent discount. (Apr. 25 Tr. at 124:18-125:25.) Carroll also understood that Salander had offered similar discounts to other art dealers. (Apr. 25 Tr. at 45:6-46:25.) Salander agreed to the forty-percent discount. (Apr. 25 Tr. at 47:1-6.)

When Carroll returned from Paris two weeks later, he reviewed the materials sent by Salander. (Apr. 25 Tr. at 42:2-7.) A few days later, on January 29 (Apr. 25 Tr. at 42:2-25), Salander called Carroll again to ask him to come into the gallery and Carroll did so that day. (Apr. 25 Tr. at 42:4-11.) Once there, Carroll was greeted by Salander's assistant, Aaron

Fitzpatrick, who led Carroll upstairs where approximately fifty works were displayed on the wall and floor for his review.  (Apr. 25 Tr. at 42:4-11.)   It was not unusual for Carroll to view artwork in this way, and indeed Carroll had viewed similar arrays at other galleries.  (Apr. 25 Tr. at 43:25-44:5.)  Fitzpatrick gave Carroll and Salander a sheet indicating the list prices of the artwork, and Salander said to Carroll: "Make me an offer."  (Apr. 25 Tr. at 49:22-50:5, 143:3.)

Carroll told Salander that he was interested in purchasing some of the art, but needed to do "some due diligence" before finalizing the transaction.  (Apr. 25 Tr. at 51:2-17.)  Carroll testified that by "due diligence" he meant that he wished to review the provenance and history of each item, as well as the "full data sheets, full digital photographs . . . and any research material" relating to each item.  (Apr. 25 Tr. at 51:6-15.)   He also wanted his art restorer to look at the works.  (Apr. 25 Tr. at 51:19-23.)  Carroll and Salander "chatted back and forth on each piece" and confirmed Carroll's interest in purchasing twenty-four specific pieces of art.  (Apr. 25 Tr. at 52:3-10.)  Carroll then "asked for an opportunity to be able to go through with Aaron [Fitzgerald] each particular piece and cataloguing and any research material which I needed . . ." (Apr. 25 Tr. at 52:10-14.)

Included in the materials given to Carroll was the "cataloguing sheet" for the Painting. (Apr. 25 Tr. at 54:3-13); (Pl.'s Ex. 4.)  The cataloguing sheet was on the letterhead of Salander-O'Reilly Galleries.  It listed the title, dimensions, year of creation and medium ("oil on canvas") of *Untitled (1943)* and contained subheadings labeled "Provenance," "Exhibitions," and "Literature."  (Pl.'s Ex. 4.)  Under "Provenance," which refers to "the chain of title to the piece," it listed (1) The Artist, (2) Private Collection, (3) Vanderwoude Tananbaum Gallery and (4) Salander-O'Reilly Galleries, New York, as the owners of the work over time, with SOG being the most recent—and therefore current—owner.  (Apr. 25 Tr. at 58:10-59:1; Stipulation of Fact ¶

7

25; Pl.'s Ex. 4.)  It did not list Craig Baker as ever being the owner.  (Stipulation of Fact ¶ 26;

Pl.'s Ex. 4.)

The sole exhibit listed for *Untitled (1943)* was "John Graham: Artist and Avatar,

organized by the Phillips Collection, Washington D.C." (Pl.'s Ex. 4.)   The sheet listed five

museums and a gallery where that exhibition was shown in 1987 and 1988 culminating in a

showing at the Phillips Collection in Washington, D.C.   (*Id.*)  Carroll borrowed a copy of the

catalogue from that 1987-88 exhibit to review.  (Apr. 25 Tr. at 57:4-18.)  The entry for *Untitled*

*(1943)* in that catalogue stated that it came from a "Private Collection."  (Pl.'s Ex. 5.)  The

catalogue contains no mention of Craig Baker.  (*See* Pl.'s Ex. 5.)

Carroll also searched for U.C.C. filings against SOG and determined that none of the

twenty four pieces he was considering buying was subject to a U.C.C. financing statement.  (Apr.

25 Tr. at 63:3-64:7; Stipulation of Fact ¶ 30.)  It is undisputed that Baker never filed a U.C.C.

financing statement recording his ownership of the Painting.  (Stipulation of Fact ¶ 12.)

After conducting this research, Carroll returned to the gallery on January 31 and

purchased twenty-four works of art, including *Untitled (1943)*.  (Apr. 25 Tr. at 64:8-13; Pl.'s Ex.

6.)  Carroll Limited paid $175,000 for the Painting, less a forty-percent discount, for a net

purchase price of $105,000.  (Pl.'s Ex. 6; Stipulation of Fact ¶ 33.)

After purchasing *Untitled (1943)*, Carroll sent it directly to his restorer who "relined"—or

"canvassed"—the Painting twice.  (Apr. 25 Tr. at 67:3-6, 69:2-18; Stipulation of Fact ¶ 41.)

"Relining," or "canvassing," is the process of re-mounting a painting onto a new canvas. (Apr.

25 Tr. at 68:8-22, Apr. 26 Tr. at 205:18-22.)  The need to reline the Painting twice indicates that

the Painting was in very poor condition, according to plaintiff's expert, Dr. Alex Rosenberg.

(Apr. 26 Tr. at 205:17- 24.)  Dr. Rosenberg had never heard of a painting being relined twice.
(Apr. 26 Tr. at 206:5-6.)

>    F.    Carroll Limited Ends its Relationship with Salander-O'Reilly Galleries

In March 2007, Carroll learned that the authenticity of two paintings by Elie Nadelman
he had purchased from SOG was being questioned by Nadelman's estate.  (Apr. 25 Tr. at 117:1-
118:5.)  Carroll asked Salander to rescind that transaction, but Salander refused.  (Apr. 25 Tr. at
118:6-11.)  Carroll then filed two arbitration claims against Salander, both of which were
eventually settled by the parties.  (Apr. 25 Tr. at 118:6-11.)

In July 2007, Carroll became aware of a Maine Antique Digest Journal article which
referred to the fact that Salander and SOG had been accused of fraud.  (Apr. 25 Tr. at 171:21-
172:4.)  Prior to the article's publication, Carroll was unaware of the substance of any allegations
against Salander and SOG.  (Apr. 25 Tr. at 172:9-19.)  From the period of 2000 to January 31,
2007, Baker was also unaware of any legal difficulties faced by SOG and, like Carroll, believed
that the gallery had a "good reputation," and was aware of no lawsuits or complaints concerning
the gallery.  (Apr. 26 Tr. at 262:15-264:25; Stipulation of Fact ¶ 4.)

>    G.    Baker Learns of the Sale of the Painting

In May 2007—four months after the sale—Leigh Morse told Baker that the Painting had
been sold to Carroll Limited for $105,000.  (Apr. 26 Tr. at 276:3-277:3.)  Baker demanded that
he be paid pursuant to the terms of the oral consignment—i.e., a minimum sale price of $250,000
less a ten percent commission for SOG.  (Apr. 26 Tr. at 277:16-278:1.)  Morse responded that
the gallery "did not have the money to pay" Baker.  (Apr. 26 Tr. at 276:11-13.)  Baker did not
file a claim against SOG or file a claim in SOG's bankruptcy proceedings, which began in
November 2007.  (Apr. 26 Tr. at 279:22-25, 280:3-19.)  In April 2009, Carroll Limited filed this

declaratory judgment action against Baker seeking a determination that it owns the Painting, and Baker has counterclaimed seeking a determination that *he* owns the Painting.   (Complaint; Answer at 9-20; Apr. 26 Tr. at 280:20-24.)

H.   Carroll's Credibility

In or around 1994, Carroll was a party to *Birch v. Carroll*, a New York state lawsuit filed by Patty Birch.  (Apr. 25 Tr. at 103:14-20.)  In that lawsuit, New York Supreme Court Justice Ira Gammerman determined that Carroll's court testimony was not credible.  (Apr. 25 Tr. at 106:19-22; *see Birch v. Carroll*, Index No. 15766-90 (Sup. Ct. N.Y. County.))  The opinion stated that "Carroll has attempted to perpetrate a fraud on both the plaintiff and the court."  (Apr. 25 Tr. at 109:12-17, Opinion in *Birch v. Carroll* dated Mar. 31, 1994 at 2.)  While the Court finds this information indeed troubling, what is of importance is whether Carroll has testified truthfully *in this action*.  The Court finds that Carroll has testified credibly in this action.

I.   The Value of the Painting

Two experts, Dr. Alex Rosenberg and Mr. Jason Rahm, testified as to the value of the Painting as of January 2007 when Carroll Limited purchased it.  The Court credits the estimated fair market value as of January 2007 of $75,000 provided by Dr. Rosenberg.

Plaintiff's expert, Dr. Rosenberg, is self-employed as an art appraiser, expert witness, and art dealer.  (Apr. 26 Tr. at 186:23-25.)  He has forty years of experience as an art appraiser and holds degrees from Philadelphia University and the Instituto Superior de Arte in Havana.  (Apr. 26 Tr. at 186:4-12.)  Dr. Rosenberg has been certified in the Uniform Standards of Professional Appraisal Practices for approximately twenty years and was re-certified in 2011.  (Apr. 26 Tr. at 188:1-24.)  He is also a member, former president, and board member of the Appraisers Association of America ("AAA")—"a personal property organization that is specific in the fields

of art and decorative art." (Apr. 26 Tr. at 188:25-189:10.) He has been certified by the AAA in the areas of "[f]ine art, impressionist, modern and contemporary art." (Apr. 26 Tr. at 189:11-20.) Dr. Rosenberg is an accredited senior member of the American Society of Appraisers ("ASA") and is certified by that organization in the areas of personal property and fine art. (Apr. 26 Tr. at 189:21-190:16.) He has experience in appraising works by American modernists, such as John Graham, and is familiar with his works. (Apr. 26 Tr. at 193:3-20; 201:17-19.)

Dr. Rosenberg operated a contemporary and modern art gallery from 1971 to 1988. (Apr. 26 Tr. at 194:11-21.) He continues to buy and sell artwork as a private dealer (Apr. 26 Tr. at 195:2-6), and is familiar with the manner in which New York-based art galleries operate (Apr. 26 Tr. at 195:20-196:9). Dr. Rosenberg was qualified, without objection, as an expert in "appraising the value of fine art" and "the usual and customary practices of buying and selling fine art." (Apr. 26 Tr. at 197:14-21.)

Defendant's expert, Jason Rahm, is an art appraiser and co-owner of New York Fine Art Appraisers. (Apr. 26 Tr. at 295:18-22.) Although he completed coursework at the City College of New York, he has no degree or formal education beyond a high school diploma. (Apr. 26 Tr. at 296:1-2; 314:5-14.) He has been an appraiser of fine arts and objects since 1980 (Apr. 26 Tr. at 296:13-16), and is a member of the AAA but is formally certified by that group only in the area of "household contents" (Apr. 26 Tr. at 314:17-25, 317:20-22). Rahm, like Rosenberg, is an accredited senior member of the ASA and a candidate member in that organization in the area of fine arts. (Pl.'s Ex. 10.) Rahm was not familiar with the works of John Graham prior to his engagement by defendant and informed himself about John Graham primarily through reading internet articles and auction catalogues after he was retained by defense counsel in this action. (Apr. 26 Tr. at 319:7-24.) Rahm was qualified, without objection, as an expert in "fine arts

11

appraisal." (Apr. 26 Tr. at 297:16-21.) He was not offered as an expert in the usual and customary practices of buying and selling fine art.

The parties agree that the market for Graham paintings is "limited" and idiosyncratic. (Stipulation of Fact ¶ 35; Apr. 26 Tr. at 201:20-202:10; 216:1-6.) From 2000 to 2006, only forty-nine percent of Graham paintings offered at auction actually sold. (Pl.'s Ex. 9 at 21.) It is undisputed that works from Graham's "masochistic period" are the most valuable. (Apr. 26 Tr. at 203:11-13, 303:22-304:2.) Paintings from Graham's "Picasso period,"[4] such as *Untitled (1943)* are less valuable. (Apr. 26 Tr. at 203:16-22.)

In selecting artwork sales for comparison purposes, the Uniform Standards of Professional Appraisal Practices provides that an appraiser should use auction sales only, if possible, and consider sales that are as close to the effective date—in this case, January 31, 2007—as possible. (Stipulation of Fact ¶ 34; Apr. 26 Tr. at 208:13-18; 209:4-16.) Sales after the effective date are considered to be generally less useful for appraisal purposes. (Apr. 26 Tr. at 209:17-23.)

Dr. Rosenberg, Carroll's expert, selected three Graham works offered for auction between 2000 and 2006 as comparable artworks. (Pl.'s Ex. 9 at 12; Apr. 26 Tr. at 207:12-24.) The first comparison artwork, *Portrait of a Woman*, was offered at auction in May 2006. The auction house estimated its value at $20,000-$30,000. The painting did not sell at that auction. (Pl.'s Ex. 9 at 12; Apr. 26 Tr. at 211:6-12.) Because the auction house would have sold the painting at $17,000, "the public felt it was worth under $17,000." (Apr. 26 Tr. at 211:6-21.) The second comparable work, *Woman Wearing Mask*, was created during a "transitional" period for

---

[4] Paintings from Graham's "Picasso period," which spanned the late 1930s and early 1940s, are said to emulate the style of Pablo Picasso. (*See* Apr. 26 Tr. at 201:25-202:20.)

Graham (i.e., containing some features of Graham's more valuable "masochistic period"), and sold at auction in October 2005 for $132,000.  (Pl.'s Ex. 9 at 12; Apr. 26 Tr. at 213:2-214:2.) The third comparable painting, *Head of a Woman – Red Eyes*, was offered at auction in December 2002 for an estimated price of $70,000-$90,000, but did not sell. (Pl.'s Ex. 9 at 12.)

Rahm, Baker's expert, also considered *Woman Wearing Mask* and *Head of a Woman – Red Eyes* as comparable artworks.  However, he considered three additional works that are less useful in assessing the value of the painting in this case—*Venere Lucifera*, *Woman with Dodecahedron*, and *Linda and the Swan*.  (Pl.'s Ex. 10 at 13.)  *Venere Lucifera* sold for $431,500 in 1999, but it is a work from Graham's masochistic period, was offered for auction "at the height of the [art] market before the market broke in the year 2000," according to the testimony, and reflects a price eight years prior to the sale at issue here.  (Pl.'s Ex. 10 at 13; Apr. 26 Tr. at 217:19-218:6.)  *Woman with Dodecahedron*—which set a record price for Graham works—sold at auction for $1,609,000 in November 2007, but was painted "at the height of Graham's career" in the 1950s, is from the masochistic period, is five or six times larger than the painting here— the testimony was that larger paintings are more valuable than smaller paintings, "all things being equal"—and was sold approximately six months after the effective date.  (Pl.'s Ex. 10 at 13; Apr. 26 Tr. at 219:8-220:11.)  *Linda and the Swan* sold for $350,000 in November 2008— "the height of the market before it broke in 2009"—and is from Graham's masochistic period. (Pl.'s Ex. 10 at 13; Apr. 26 Tr. at 220:12-222:10.)  Given the dissimilarity of these three pieces of art to the painting at issue, as well as the distance in time of these auctions from the effective date, the Court finds that the comparable works chosen by Dr. Rosenberg are a more accurate reflection of the painting's value in January 2007 than the paintings employed by Mr. Rahm in his analysis.

Dr. Rosenberg appraised *Untitled (1943)* at $75,000.  (Apr. 26 Tr. at 201:6.)  Rahm appraised it at $180,000.  (Apr. 26 Tr. at 298:19-21.)  The Court adopts Dr. Rosenberg's appraisal figure for the following reasons:  First, Rosenberg was better qualified to appraise the value of this particular painting.  As noted above, Rahm, unlike Dr. Rosenberg, was unfamiliar with Graham's work prior to his engagement by defendant, and is certified by the AAA solely in "household contents," not in fine art appraisal.  Second, Rosenberg utilized a more reliable method to select comparable paintings, and those comparable paintings indicate that $75,000 is a fair appraisal of the Painting's fair market value.  Third, it is undisputed that works from Graham's "masochistic period" are the most valuable.  (Apr. 26 Tr. at 203:11-13, 303:22-304:2.)  *Untitled (1943)* is from a different, less valuable, period, the "Picasso period."  (Apr. 26 Tr. at 203:16-22.)  Fourth, it is undisputed that the poor condition of the Painting as it existed in January 2007 substantially reduced its value.  (Apr. 26 Tr. at 205:10-15, 323:7-13.)  Fifth, the fact that the Painting had been on public display for sale at SOG for seven years at the price of $175,000—and did not sell—helps substantiate that the fair market value is below that price.  Both experts agreed that the length of time the Painting was on consignment reduced the estimate of its fair market value.  (Apr. 26 Tr. at 225:2-3; Apr. 26 Tr. at 321:2-322:3, 331:12-18.)

J.     Usual and Customary Practices in the Buying and Selling of Fine Art

The retail markup on art offered for sale at art galleries is "at least a hundred percent," (Apr. 26 Tr. at 226:2-10.)[5]  In this particular instance, "almost every" one of the works of art

---

[5] Dr. Rosenberg, unlike Mr. Rahm, was offered as an expert in "the usual and customary practices for buying and selling fine art."  (Apr. 26 Tr. at 197:15-19.)  Rahm was offered as an expert only in the appraisal of fine art (Apr. 26 Tr. at 297:16-20), and he specifically and repeatedly disclaimed knowledge of how dealers operate (*see* Apr. 26 Tr. at 332:7-12, Apr. 27 Tr. at 355:11-14).  Rahm nonetheless testified briefly about retail markups at galleries and how dealers determine the appropriate discount for a piece of art.  (Apr. 26 Tr. at 323:16-325:20, 330:6-13, Apr. 27 Tr. at 354:11-24.)  To the extent that Rahm 's testimony on the usual and customary practices of buying and selling fine art differs from Dr. Rosenberg's testimony, the Court credits Dr. Rosenberg's testimony.

14

purchased by Carroll had a "highly inflated" list price.  (Apr. 26 Tr. at 228:7-11.)  Because list

prices are substantially inflated, it is not uncommon for dealers purchasing art to receive a

discount from the listed price of a painting.  (Stipulation of Fact ¶ 37; Apr. 26 Tr. at 224:8-18,

227:22-23.)  There are many variables that factor into the decision to discount artwork, including

whether the purchaser is a dealer; whether the purchaser is buying multiple works; whether the

artwork is in good condition; whether the artwork can be easily replaced; and whether the seller

needs cash.  (Apr. 26 Tr. at 224:20-226:7.)  Under normal circumstances, the purchaser would

not be privy to all of the factors bearing on the dealer's decision as to how much of a discount to

offer.  (Apr. 26 Tr. at 376:16-21.)   It is not unusual for dealers to offer another dealer a "dealer

discount," as well as a volume discount and a discount if the painting is in poor condition.  (Apr.

26 Tr. at 225:6-18, 325:14-21.)  Defendant's expert agreed that volume discounts are not "out of

the ordinary" in the industry.  (Apr. 26 Tr. at 325:25-326:4.)  According to Carroll's expert, a

dealer buying twenty-four works of art at a forty-percent discount from another dealer would not

raise suspicion in the art industry.  (Apr. 26 Tr. at 227:4-8, 228:12-16.)

 The Court finds, and Dr. Rosenberg and Mr. Rahm both agree, that it is not customary in

the art industry for a purchaser of art to investigate extensively the ownership of a work of art.

(Apr. 26 Tr. at 233:4-25; Trial Tr. dated Apr. 27, 2012 ("Apr. 27 Tr.") at 368:20-25.)   The

uniform testimony at trial was that when purchasing art from a reputable gallery, it is not

customary for the purchaser to ask the gallery for proof of ownership prior to consummating the

transaction.  (Apr. 26 Tr. at 233:4-7.)  As even Baker concedes, it is not customary for a

purchaser to ask a seller whether a piece of art is held on consignment or whether the seller owns

it himself.  (Apr. 26 Tr. at 233:15-19, 260:12-20.)  The Court finds, and both Baker and Dr.

Rosenberg agree, that an art buyer looking at the cataloguing sheet provided to Carroll by SOG

would be led to believe that the owner of the Painting was SOG.  (Apr. 26 Tr. at 228:22-229:4, 275:6-15.)  In addition, the steps taken by Carroll to investigate the Painting—inspecting the Painting in person; looking at the Phillips Collection catalogue from the exhibition where the Painting had been displayed; looking at a written provenance statement; having a restorer assess the Painting; checking the U.C.C. filings—are usual and customary in the art industry, if not more than the usual and customary procedures.[6]  (Apr. 26 Tr. at 230:3-13.)

## II.      CONCLUSIONS OF LAW

### A.      Article 2 of the New York Uniform Commercial Code

Article 2 of the New York Uniform Commercial Code governs the power to transfer rights in a good as follows:

> A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though
>
> (a) the transferor was deceived as to the identity of the purchaser, or
> (b) the delivery was in exchange for a check which is later dishonored, or
> (c) it was agreed that the transaction was to be a 'cash sale', or
> (d) the delivery was procured through fraud punishable as larcenous under the criminal law.
>
> N.Y. U.C.C. § 2-403(1).

With respect to merchants, Article 2 specifies that "[a]ny entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business."  N.Y. U.C.C. § 2-403(2).  The parties have stipulated that at the time of Carroll Limited's purchase of the painting from SOG in January

---

[6] Dr. Rosenberg testified that Carroll's decision to check for U.C.C. filings relating to the Painting actually reflects a more thorough investigation than was customary in the art industry in 2007, prior to the unexpected bankruptcy of another respected New York art gallery.  (*See* Apr. 26 Tr. at 230:14-232:24.)

2007, and at all other relevant times, Salander, SOG, and Carroll Limited were each "merchants"[7] dealing in fine art such as the Painting pursuant to N.Y. U.C.C. § 2-403(2). (Stipulation of Law, Ex. A to Joint Pretrial Disclosures ¶¶ 2, 5.)  The parties have also stipulated that Baker's consignment of the painting to SOG on or around July 12, 2000 constitutes an "entrusting" of possession of goods to a merchant within the meaning of N.Y. U.C.C. § 2-403(3).[8]  (Stipulation of Law ¶ 1; Apr. 26 Tr. at 261:1-6.)  We therefore know that SOG had the ability to transfer all of Baker's rights in *Untitled (1943)* to a "buyer in ordinary course of business."  The sole issue for disposition is whether Carroll was a buyer in ordinary course of business.

> Article 1 of the N.Y. U.C.C defines "buyer in ordinary course of business" as follows:
>
> '[b]uyer in ordinary course of business' means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind.  A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. . . . Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under article 2 may be a buyer in ordinary course of business.
>
> N.Y. U.C.C. § 1-201(9); (Stipulation of Law ¶ 4(a)-(c).)

" 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."  N.Y. U.C.C. § 2-103(1)(b); *see also Porter v. Wertz*, 53 N.Y.2d 696, 701 (1981); (Stipulation of Law ¶ 6.)

---

[7] A " '[m]erchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."  N.Y. U.C.C. § 2-104(1).

[8] N.Y. U.C.C. § 2-403(3) provides that " 'Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods has been such as to be larcenous under the criminal law."

B.      The Presence of "Warning Signs"

The New York Court of Appeals noted in the leading case of *Porter v. Wertz* that "[t]he

'entruster provision' of the Uniform Commercial Code is designed to . . . shift[] the risk of loss

through fraudulent transfer to the owner of the goods, who can select the merchant to whom he

entrusts his property."  53 N.Y.2d 696, 698 (1981).  However, "where there are warning signs

about problems in a sale," merchants purchasing art have "an added duty of inquiry."[9]  *Brown v.*

*Mitchell-Innes*, No. 06 Civ. 7871, 2009 U.S. Dist. LEXIS 35081, at *19 (S.D.N.Y. April 24,

2009); *see also Interested Lloyd's Underwriters v. Ross*, No. 04 Civ. 4381, 2005 U.S. Dist.

LEXIS 25471, at *13-14 (S.D.N.Y. October 31, 2005); *Cantor v. Anderson*, 639 F. Supp. 364,

367-78 (S.D.N.Y. 1986); *Morgold, Inc. v. Keeler*, 891 F. Supp. 1361, 1368-69 (N.D. Cal. 1995);

*Porter v. Wertz*, 68 A.D.2d 141, 146 (2d Dep't 1979).[10]  Examples of circumstances that

constitute "warning signs" sufficient to trigger "an added duty of inquiry" include (1) whether

the sale price is "obviously below market," *Mitchell-Innes*, 2009 U.S. Dist. LEXIS 35081, at

*21, (2) whether the "negotiations or procedure of the sale differed" from previous transactions

between buyer and seller, *id.*, (3) whether the buyer was aware of the seller's "financial

difficulties," *Cantor*, 639 F. Supp. at 368, or (4) whether the buyer would have "reason to doubt"

the seller's ownership of the artwork, *id.*

The Court need not determine the precise nature of the inquiry a merchant must

undertake to satisfy this "added duty of inquiry," because the Court finds on the facts as adduced

---

[9] The precise extent of this "added duty of inquiry" is unclear.  Some case law suggests that, simply by investigating the provenance of the painting, Carroll satisfied this requirement.  *See Interested Lloyd's Underwriters*, No. 04 Civ. 4381, 2005 U.S. Dist. LEXIS 25471, at *13 (S.D.N.Y. October 31, 2005) ("Many lower courts have held that to be a purchaser in the ordinary course within the meaning of § 2-403 an art dealer must investigate the provenance of a work of art being purchased, even if the work is being purchased honestly and from a reputable dealer.").

[10] The New York Court of Appeals did not reach the issue of whether it is a departure from reasonable commercial standards for an art dealer to fail to inquire into the title to an artwork in *Porter v. Wertz*, 53 N.Y.2d 696, 701 (1981).  It appears that it also has not done so in the thirty-one subsequent years.

at trial, the circumstances of the sale of *Untitled (1943)* did not present sufficient warning signs to warrant additional investigation by Carroll.  While Carroll's pre-purchase relationship with Salander and SOG contained some oddities—the liens, the question as to which business entity was conducting the transaction, the Stuart Davis catalogue raisonné, the potential for a postdated check—none of these minor events were sufficient to raise suspicion regarding SOG's ownership of the painting.  Indeed, from 2000 to January 2007, both Carroll and Baker thought that SOG had "a good reputation" and were unaware of any financial or legal difficulties facing the gallery. (Apr. 25 Tr. at 20:3-20, 28:11-15; Apr. 26 Tr. at 262:15-263:14.)

For the reasons set forth, the Court credits Dr. Rosenberg's appraised value for the Painting as of January 2007 of $75,000.  The Court therefore finds that the $105,000 purchase price of the painting was not "obviously below market [value]," *Mitchell-Innes*, 2009 U.S. Dist. LEXIS 35081, at *21, and would not have raised suspicion regarding the sale of the painting.

The Court finds that Carroll Limited would have had no reason to doubt SOG's ownership of the painting on the basis of its investigation into the painting's provenance.  Carroll undertook a usual and customary inquiry into the title of the painting and found nothing suspicious.  In addition, both parties agree that an art buyer looking at the cataloguing sheet provided to Carroll by SOG would have been led to believe that the owner of the painting was SOG.  (Apr. 26 Tr. at 228:22-229:4, 275:6-15.)

Finally, the Court finds that the immediate circumstances surrounding the sale of the painting did not constitute a warning sign that warranted additional investigation by Carroll.  As noted above, Carroll had purchased groups of multiple paintings from Salander previously, and often was called into galleries to look at artwork for possible purchase.  (Apr. 25 Tr. at 19:4-14, 40:12-41:3.)  The Court credits Dr. Rosenberg's testimony that a dealer buying twenty-four

works of art from another dealer at a forty-percent discount off of the list price would not have raised suspicion under the mores of the art industry, as testified to in this trial.  (Apr. 26 Tr. at 227:4-8, 228:12-16.)  Although Salander's statement, "Make me an offer" (*see* Apr. 25 Tr. at 143:3), could be seen as inconsistent with Salander's general practice of eschewing negotiations over price (*see* Apr. 25 Tr. at 122:9-21), it is clear from the record evidence that Carroll did not actually make Salander an offer or negotiate with Salander.  Rather, Carroll purchased the twenty-four pieces of art for the prices set by Salander, less the forty-percent discount that Carroll had previously requested and been granted.  (*See* Pl.'s Ex. 6.)  The Court cannot find, on the basis of the evidence presented at trial, that the circumstances surrounding the sale of the Painting raised warning flags that should have led Carroll to question the ownership of *Untitled (1943)*.

The Court finds that Carroll Limited (1) purchased the Painting in good faith, without knowledge that the sale violated the rights of another person in the Painting, and (2) the sale comported with the usual or customary practices in the art industry.  The Court therefore finds that Carroll Limited acted as a buyer in the ordinary course of business when purchasing *Untitled (1943)*.  *See* N.Y. U.C.C. § 1-201(9).  As Carroll Limited was a buyer in the ordinary course of business, Salander transferred all of Baker's rights in the painting—i.e., full title—to Carroll Limited when Carroll Limited purchased the artwork.  *See id.*; *Porter v. Wertz*, 53 N.Y.2d 696, 700 (1981). Carroll Limited therefore holds title to the painting.

The Court is not unsympathetic to the plight of Mr. Baker, an innocent person who now bears the burden of Salander's fraudulent conduct and whose recourse may be limited to attempting to recover against a bankrupt felon.  Nonetheless, as set forth above, the Court

concludes that Carroll observed the "reasonable commercial standards of fair dealing in the [art] trade" when he purchased *Untitled (1943)* from SOG in 2007.

## III.   CONCLUSION

The Court finds that based on the evidence presented at trial, Carroll Limited bought the Painting as a buyer in the ordinary course of business and holds full title to the Painting. The Clerk of Court is directed to enter judgment in favor of Joseph P. Carroll Limited and dismissing defendant's counterclaims.[11]

Dated: New York, New York
      August 29, 2012

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.

---

[11] The success of defendant's counterclaims— unjust enrichment, conversion, replevin and declaratory judgment— is concededly dependent on the Court finding that plaintiff was not a buyer in the ordinary course of business. (*See* Apr. 25 Tr. at 6:18-7:3.) Given the Court's decision, the counterclaims are no longer at issue.